# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 15, 2011 Session

## MARCELLA E. MAY v. DONALD B. MAY, ET AL.

**Appeal from the Domestic Relations Court for Meigs County**
**No. D-760     Jayne Johnston Crowley, Judge**

---

**No. E2010-01026-COA-R3-CV-FILED-NOVEMBER 29, 2011**

---

After twenty-five years of marriage, Marcella E. May ("Wife") sued Donald B. May ("Husband") for divorce. Husband's adult son Donald P. May ("Son") was added later to the suit as a defendant concerning a real property transfer. After a trial, the Trial Court entered its Final Decree of Divorce, *inter alia*, awarding Wife a divorce, dividing the marital property, awarding Wife transitional alimony, and awarding Wife judgment for attorney's fees against Husband. After further hearing, the Trial Court entered subsequent orders awarding Wife $63,474.34 in attorney's fees and $2,965.77 in costs against Husband, and $4,083.50 in attorney's fees against Son. Husband and Son appeal to this Court raising issues regarding the classification and distribution of specific property, and the awards of alimony and attorney's fees. We affirm with regard to the classification and distribution of property, the award of alimony, and the award of attorney's fees against Husband. We find and hold that no contractual or statutory basis allowed for an award of attorney's fees against Son, and we, therefore, vacate the award to Wife of a judgment for attorney's fees against Son.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Domestic Relations Court
Affirmed, in part; Vacated, in part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

D. Mitchell Bryant, Athens, Tennessee, for the appellants, Donald B. May and Donald P. May.

Harold L. North, Jr., Chattanooga, Tennessee, for the appellee, Marcella E. May.

# OPINION

## Background

Husband and Wife married in 1983. No children were born of the marriage. Wife sued Husband for divorce in 2008. Wife later alleged that certain marital real property had been erroneously or fraudulently conveyed to Son, and Wife was granted leave to amend her complaint to add Son as a defendant to the suit concerning this real property. The case proceeded to trial without a jury.

At the time of trial, Husband was 75 years old and had no health issues. Husband holds a degree in poultry science and agriculture from the University of Georgia with a minor in business law and a minor in economics. He was employed for fifteen years at Mayo Chemical as a director of sales and as a manager. Husband retired from Mayo and began employment as a consultant for Dycho in 2002. Husband earns $1,250 per month in his position with Dycho and works whatever hours he chooses. He also receives reimbursement for his expenses.

Husband and Wife own a farm in Decatur, Tennessee ("the Farm"), which was the parties' marital home. The Farm consists of approximately one hundred and fifty acres. Husband admitted that during a meeting with an attorney in December of 2005 for estate planning purposes, Husband told the attorney that the Farm had a value of close to $1 million. Wife testified that Husband told her the Farm was worth over a million dollars. She stated that during the estate planning meetings with the attorney, Husband told the attorney that the Farm was worth "anywhere from a million and a half to two." Husband remained in the marital home on the Farm during the pendency of the divorce.

Husband and Wife also own a cabin and lot in Gatlinburg. The Gatlinburg cabin was purchased by Husband approximately two years before the parties were married. After the marriage, Husband conveyed a one-half undivided interest in the Gatlinburg property to Wife. At trial, the parties stipulated that the Gatlinburg property was worth $185,000 for both the cabin and the lot.

During the pendency of the divorce, the Trial Court ordered that the Farm be listed for sale. When asked, Husband admitted that he was at the hearing where the Trial Court ordered that the Farm be listed for sale, but that he had not listed the Farm for sale. When asked why he had not complied with the Trial Court's order, Husband stated: "I just didn't do it." Husband admitted that he did not want to list the Farm for sale. Husband admitted that the Trial Court also had ordered that the Gatlinburg property be listed for sale

and that he had not done that either. When asked why he had not listed the Gatlinburg property for sale, Husband stated: "Just negligence…. I just didn't do it."

During the marriage, Husband's and Wife's regular household expenses were paid from their joint First Tennessee Bank account ("First Tennessee Account"). After Wife filed for divorce, Husband took Wife's name off the First Tennessee Account and put Son's name on it.

Husband inherited $688,000 during the marriage. This money was deposited into Husband's and Wife's First Tennessee Account. Husband testified that he later moved the money into an account with the Hartford Fund ("Hartford Account") in Husband's name only. Husband stated:

> I had to - - where the people mailed the check, I had to give them an account number and account bank number so they could deposit it at First Tennessee Bank. It was only in there just to say that the bank got it. I didn't write any checks, nothing off of it. It was immediately put in to investment.

Husband claimed that First Tennessee Bank moved the money into the Hartford Account "immediately," but when asked exactly when that was done, Husband stated: "I cannot tell you. Don't know." Husband admitted that the inheritance money was commingled with marital funds in the First Tennessee Account, and that he did not know how much money was in the First Tennessee Account at the time of the $688,000 deposit. Husband claimed there was no way to trace that to find out.

Husband testified that he used some of the money from his inheritance to purchase two trucks for himself and one for his daughter, a Jaguar for Wife, a camper, and various farm implements and stated: "I had to transfer some money from Hartford to my bank account." The camper cost approximately $32,000. When asked about moving the money from the First Tennessee Account to the Hartford Account and then back to the First Tennessee Account, Husband admitted that during his deposition he had stated: "I can't tell you how much all I put in at one time. I can't tell you. I don't know. I held out some of the money. I can't tell you." Husband did not know how much of the money he had held out, but Husband also stated that all of the inheritance money went into the Hartford Account.

Husband testified that the money was in the Hartford Account since 2003. During his deposition, Husband stated: "I turned that money over to First Tennessee and it took awhile to invest that money." Husband stated:

> I don't know how quickly the money went out of the [First Tennessee]

account. I cannot - - I don't remember. It was 2002, and I don't know how much money I had in there. I don't know how much money I took out and I don't know when Hartford took the money out or First Tennessee put it out into Hartford. They invested that money in stages.

Husband admitted that while the inheritance money was in the First Tennessee Account, he put his income into that account and paid marital expenses out of that account. Husband agreed that he thought that it would be financial chaos to try to recreate when the inheritance money came in to and went out of the First Tennessee Account.

Although he was asked for the First Tennessee Account and Hartford Account records during discovery, Husband failed to produce either. Husband admitted that he threw away the First Tennessee Account and Hartford Account records. He stated: "I didn't need them." When asked why he did not spend time trying to recreate the details about the money that went from the First Tennessee Account to the Hartford Account, Husband stated: "I had no reason to…. Yeah. You know, I'm lost for words right now." Husband admitted that he worked with his attorney to prepare an exhibit documenting his 401(k) contributions going back to 1977. Husband admitted that he would only have had to go back to 2002 or 2003 to document the Hartford Account, and that he could have done the same for the Hartford Account as he did for his 401(k). Husband also admitted that he had been asked during discovery to produce the Hartford Account records.

Husband admitted that out of the money coming from the First Tennessee Account he purchased a John Deere Gator for $9,000, a Grasshopper lawnmower for $16,000, a hay rake for $850, a Grain-O-Vator, a New Holland feed mixer for $3,500, a 12-foot mower for $2,000, a new barn for $65,000, a new watering system, a gooseneck trailer for $32,000, a Filson head shoot for $2,400, a herd of cattle for $20,000, two bulls, a swimming pool for $26,000, and closed in a front porch for $2,600. Husband stated that he purchased these items over a period of several years.

Husband was unsure how much money was in the Hartford Account at the time of trial, but he approximated it at $130,000. When asked if there had been $300,000 in the Hartford Account at the time the divorce was filed, Husband stated: "I don't remember." Husband claimed that the money in the Hartford Account went toward alimony while the divorce was pending. When questioned further, Husband testified that he also paid some of Wife's bills from the Hartford Account.

Husband testified that there was $900 in the First Tennessee Account at the time of trial. During his deposition Husband had stated that there was $12,000 in the First Tennessee Account. When asked about the depletion of the First Tennessee Account,

-4-

Husband stated: "I wrote two checks today and there won't be any money in it.… I wrote an $85 check for my water bill. I've got insurance to pay. I wrote close to $800 worth of checks this morning I mailed." When questioned further about the $12,000, Husband stated: "That's for alimony."

Husband also admitted that he has a farm account, but claimed there was only $100 in that account, and an alimony account, which had $500 in it. When asked why he had a separate alimony account, Husband stated: "That's the way I can keep up with it. I had paid her already 30,000 this year in alimony."

Husband admitted that he has taken $66,775.93 from the Hartford Account since the divorce was filed. Husband admitted that the Trial Court had ordered that Wife was to get $2,500 per month in alimony during the divorce and that Husband had paid through June for twelve months for a total of $30,000. Husband admitted that the other $37,000 that he had taken out of the Hartford Account had been for his own benefit. When asked, Husband admitted that since the divorce was filed he has traveled to Florida twice with his friends from the Highland Sportsman Club, but claimed that these trips were at no cost to him.

Husband testified that he receives $1,728 per month in Social Security and $1,250 per month from Dycho, and that he also takes $1,000 per month from the Hartford Account. Husband admitted that he had been taking the $1,000 per month from the Hartford Account prior to the parties separating to "help run the household." Husband admitted that his arrangement with Dycho could last forever, but claimed that he had decided to leave Dycho and retire. Husband admitted that he had made this decision to leave Dycho because of the divorce.

Wife was 59 years old at the time of trial. Wife went to school through the eleventh grade and then took her GED test. She has no special training or certifications, no vocational training, and is not proficient on computers. Wife testified that she worked as an executive secretary for L.P. Muller & Company from 1975 until 1985. Wife then worked for Henry Crumbliss Yarns as an executive secretary from 1985 until 1995. After that, Wife started cleaning houses and working part-time for the Chattanooga Riverboat, which is seasonal work. During the season, Wife worked for the Chattanooga Riverboat two days or sixteen hours a week. Wife has had squamous cell cancer and has a sciatic nerve in her hip that causes her some problems and pain when she works cleaning houses.

At the time of trial, Wife worked cleaning houses. She testified that she cleans two houses on a regular basis. Wife cleans one of those houses every week for a monthly income of $160. Wife cleans the other house every other week and makes $100 per month

cleaning this house. Wife testified that she has passed out fliers in an attempt to gain more clients for her house cleaning, but has not had any response to the fliers.

Wife also had sold Mary Kay cosmetics and Park Lane Jewelry. Wife described these activities as a hobby. At the time of trial, Wife was not actively selling Mary Kay and the Mary Kay company had designated Wife's status as inactive. Wife testified that she had not had any sales of Park Lane Jewelry in a couple of months and stated that she had only had one Park Lane Jewelry party this year. Wife feels that she has exhausted her sources for selling Park Lane Jewelry.

During the marriage, Wife did the housework, the laundry, the cooking, and yard work. Wife purchased all of her clothes and also purchased clothes for Husband. Wife stated: "I paid for my car. Then I paid for my medicine, my doctor bills. I bought everything for the house, you know, the furniture, accessories. I bought Christmas gifts and, of course, I bought everybody's clothes and I bought groceries." During the marriage, Wife received $4,000 in an inheritance which she spent on furniture for the marital home.

Wife testified that Husband "was controlling with the finances." Wife testified that Husband would allow her to put gas in her car only once a month. Wife would give plasma twice a week to earn money. When asked how much money she earned by donating plasma, Wife stated: "Well, it started out $40. Now, it's down to 30, but it was 20 each - - 20 twice a week." Wife has been donating plasma for about ten years.

Wife has an account at SunTrust Bank and an account at Regions Bank. Wife testified that at the time of trial there was $52 in the SunTrust account and $126 in the Regions account. Wife deposits her alimony and the money she earns from housecleaning into those accounts. Wife testified that she will be eligible to draw $796 per month in Social Security when she turns 62. Wife has no retirement account.

After the trial, the Trial Court entered its Final Decree of Divorce on December 10, 2009 finding and holding, *inter alia*:

> 2. [Wife] and [Husband] have been married for twenty-six years. No children were born of their marriage. At the time of trial, [Husband] was 75 years old, and [Wife] was 59 years old.
>
> 3. The Court notes that [Husband's] testimony lacked significant credibility in several respects in that his testimony ranged from contradictions with his earlier deposition testimony to forgetfulness concerning various relevant matters.

4. **[Husband's] education and health:** [Husband] has a degree from the University of Georgia. [Husband] is "semi-retired" (sic), but continues to work as a consultant for Dycho, earning $1,250.00 per month. In addition, [Husband] is reimbursed for expenses up to $800.00 per month. [Husband] also receives Social Security benefits in the amount of $1,728.00 per month, and has routinely withdrawn at least $1,000.00 per month from an account known as the "Hartford Fund", discussed hereinafter. Although he indicated during his depositions that his work with Dycho could last "forever" (sic), Defendant changed his testimony at trial, claiming it was his intent to retire at some point after the divorce. [Husband's] physical condition is not unusual for a man of his age; he appeared at trial to be in good health, but with some cognitive difficulties. However, since the court had no evidence of [Husband's] everyday demeanor, there was no way to determine whether his difficulties were due to the nervousness often seen in courtroom proceedings or to some other problem.

5. **[Wife's] education and health:** [Wife] has a high school education. [Wife] has not maintained regular full-time employment outside the marital home in many years. At the time of the filing of her divorce complaint, [Wife] generated limited income to pay for "gas money and spending money" (sic) from cleaning a few homes in the Chattanooga area, and from selling her blood plasma on a regular basis. [Wife] has suffered from squamous cell carcinoma, and has recurrent problems with her sciatic nerve.

6. **Standard of living during the marriage:** The proof at trial showed that the parties enjoyed a relatively high standard of living during the marriage. They owned (1) a home and adjacent farm on 150 acres (the "Farm Property"); (2) a cabin and adjacent property in Gatlinburg (the "Gatlinburg Property"); (3) a trailer in Tellico; (4) newer model vehicles; (5) personal property, including farm equipment and implements, worth approximately two hundred fifty thousand dollars [see, Master Asset List]; and (6) funds in financial accounts which totaled, at the time of the divorce filing, approximately $300,000. The parties' indebtedness approximates $50,000.00, and is made up of debt against [Husband's] truck and the farm equipment, and credit card debt of about $8,000.00 [see, Master Asset List, Liabilities].

\* \* \*

8. **[Wife's] attorney fees:** [Wife] is entitled to a judgment for attorney fees in

this cause. This is supported by [Husband's] behavior during the pendency of this matter including: (1) his continued harassment of [Wife], which led to him being held in contempt at the hearing on September 30, 2008; (2) his refusal to comply with the prior order of the Court, of July 31, 2008, directing the listing of the Farm Property for sale, because he "just didn't want to" (sic); (3) his refusal to acknowledge in the months prior to trial that the deed from [Wife] to his son, Donald P. May, was erroneous and should be set aside; (4) his assertion at his original deposition that [Wife] was not guilty of inappropriate marital conduct, only to amend his answer the next day to assert that [Wife] was guilty of such conduct, which he attempted to substantiate by claiming that [Wife] is a lesbian; (5) his refusal to comply with the order of the Court, of October 28, 2008, requiring him to account for his disposition of the Hartford Fund; (6) his taking [Wife's] name off of their joint checking account following the divorce filing; and (7) his destruction of various records concerning the Hartford Fund and First Tennessee accounts following the divorce filing. The Court determines that [Wife] should be awarded her attorneys' fees from [Husband], in that she otherwise lacks sufficient funds to pay such fees, and her ability to pay the fees is solely dependent upon her use of the assets awarded her in the divorce. [Wife] has no independent assets within which to satisfy such fees. Such determination is all the more appropriate in this case, as [Husband's] conduct necessitated the incurring of significant and substantial attorneys' fees which [Wife] should not have had to bear, but for the harassing and contemptuous conduct by [Husband].

9. **[Wife's] claim for alimony:** In considering [Wife's] claim for alimony, the Court finds that, primarily because of [Wife's] age, minimal education, and lack of significant employment for the last several years, [Wife] is entitled to nonmodifiable transitional alimony. Upon consideration of the factors set out under Tenn. Code Ann. § 36-5-121(h)(3)(i), the Court determines that [Wife] is entitled to transitional alimony from [Husband], in the amount of $1,500.00 per month, until both the Farm and Gatlinburg properties are sold. It is the Court's hope that [Husband's] continued alimony obligation to [Wife], until both properties are sold, will not only provide [Wife] with necessary support pending the sale of those assets, but also effectively motivate [Husband] and his relatives to cooperate in the expeditious listing and sale of those assets. In determining [Wife's] need for alimony, the Court has considered, among other factors, the primary considerations of [Wife's] need and [Husband's] ability to pay. As discussed above, [Wife] has previously suffered from cancer and has recurrent sciatic nerve problems.

-8-

\* \* \*

11. **Commingling of financial assets:** While [Husband] argues vigorously for the proposition that most of the other assets involved in this proceeding are separate property, [Wife's] argument for commingling of assets is granted significant weight by the Court.  It became clear during the several days of hearing in this matter that neither party, whether intentionally or not, maintained a particularly firm grasp of the family finances. [Wife] testified at trial that she had little to do with the finances of the parties because [Husband] refused to allow her to do so.  [Husband] testified that, after the petition for divorce was filed, he did not keep banking or investment records and that the parties' finances were not subject to a clear division as separate and marital.

12. **First Tennessee Bank account:** Testimony from both parties at trial was that [Wife] maintained a checking account in her own name, which she used for household expenses as well as her personal needs and [Husband] maintained a checking account in both parties' names (the First Tennessee Bank account), which the parties agreed [Wife] did not use. [Wife] testified that she was not allowed to make use of the joint account. [Husband] did not dispute this claim.  The joint account was used for major purchases, household expenses, family holidays and personal needs.  It did not appear from testimony or documentary evidence that there was any particular distinction made between funds deposited in the joint account from employment income, inheritance income, investment income, or, indeed, any other source of income.  Despite discovery requests and direction from the Court to provide banking records from the First Tennessee Bank Account, [Husband] failed to do so.

Following the inheritance by [Husband] and his sister of certain property in Hamilton County that property was sold and [Husband's] share of the proceeds was deposited in the parties' joint checking account at First Tennessee Bank.  At the time the proceeds were deposited into the joint checking account, that account had on deposit marital funds from various sources.  Despite numerous requests from [Wife], [Husband] was unable to produce relevant documents showing the amount and source of funds used to establish the Hartford Fund. [Husband] indicated that he does not know how much was in the First Tennessee joint account at the time of the deposit of the proceeds from the sale of the inherited property, and stated in his depositions and at trial that there was "no way" (sic) to find that out.

Following the deposit of the inherited funds in the joint First Tennessee account, the parties purchased, from that account, various vehicles and farm equipment for themselves and their relatives. [Husband] indicated that such purchases occurred over several years, and that the inherited money "stayed in that [joint] account for awhile." (sic) During that time, there were other funds going in and out of the account on a routine basis, such as [Husband's] income and payment of the parties' various expenses.

[Husband] testified that he did not maintain the statements from First Tennessee Bank, and proceeded to throw away the statements for this account following the divorce filing, because he "didn't need them" (sic). He admitted that he threw away "a bunch of records" (sic) after [Wife] filed for divorce, because he "cleaned out his desk" (sic). Because the funds passing through the First Tennessee Bank account are determined by the Court to be marital property, on the theory that they have been so commingled that, by [Husband's] own admission, it would be "financial chaos" (sic) to attempt to untangle them, any assets purchased with funds from the First Tennessee Bank account are marital assets as well.

13. **Establishment of the Hartford Fund account:** At some point, [Husband] removed a portion of the funds from the jointly-owned First Tennessee Bank account to establish the Hartford Fund, but was unable to state how much money was initially used to set up the Fund, only that he held out "some of the money" (sic) from the joint account. [Husband] reiterated that he has no idea what money he took out of the joint First Tennessee account to open the Hartford Fund, and acknowledged that he left "quite a bit" (sic) of money in the First Tennessee account to pay for, among other things, various items of personal property. [Husband] further indicated that it "took a while" (sic) to open the Hartford account. He also stated that it was impossible to trace the money that came in and out of the First Tennessee account, in that it would be "absolute financial chaos" (sic). In addition to the apparent lack of any effort by [Husband] to specifically trace the funds that came into the First Tennessee account and Hartford Fund, there was no credible testimony at trial that the Hartford Fund was to be [Husband's] separate property. Both parties testified that the monthly withdrawals made from the Hartford Fund were used to pay their routine expenses. Taking all of this together, the Court finds that the Hartford Fund account is a marital asset.

(notations '(sic)' appear in original). In the Final Decree of Divorce, the Trial Court also found and held that Son's claim to an interest in the Farm was based upon an erroneous deed,

which the Trial Court set aside and held for naught.

Husband filed a motion to alter or amend or for a new trial. After a hearing, the Trial Court entered its order on March 25, 2010 denying Husband's motion, in part, and granting it, in part. Specifically, and as relevant to this appeal, the March 25, 2010 order awarded Wife a judgment for $25,000 in attorney's fees against Husband, and a judgment of $4,083.50 for attorney's fees against Son.

Wife filed a motion to alter or amend the March 25, 2010 order. After a hearing, the Trial Court granted Wife's motion to alter or amend, in part, and reserved the issue of attorney's fees. Wife subsequently filed an Emergency Petition for Contempt alleging, in part, that Husband was failing to comply with the Trial Court's orders. The Trial Court held a hearing on Wife's Emergency Petition for Contempt and entered its order September 16, 2010 *nunc pro tunc* to September 3, 2010 finding and holding, *inter alia*, that Wife should be and was awarded a judgment against Husband "for all attorneys fees and related expenses incurred by her in the divorce proceeding, through December 21, 2009, in the total amount of $63,474.34, and that [Wife] shall have and recover judgment against [Husband] for her discretionary costs in the divorce proceeding, in the total amount of $2,965.77." Husband and Son appeal to this Court.

**Discussion**

Although not stated exactly as such, Husband and Son raise five issues on appeal: 1) whether the Trial Court erred in classifying certain property as marital property; 2) whether the Trial Court erred in dividing the marital property; 3) whether the Trial Court erred in awarding Wife alimony; 4) whether the Trial Court erred in awarding Wife a judgment for attorney's fees against Husband; and, 5) whether the Trial Court erred in awarding Wife a judgment for attorney's fees against Son. Wife requests an award of attorney's fees on appeal.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in classifying certain property as marital property. Specifically, Husband contests the Trial Court's classification and division as marital property of the money in the Hartford Account, which is what remains of

the $688,000 that Husband inherited during the marriage.[1]   As our Supreme Court has explained:

> Tennessee is a "dual property" state because its domestic relations law recognizes both "marital property" and "separate property."  *See generally* Tenn. Code Ann. § 36-4-121; *Eldridge v. Eldridge*, 137 S.W.3d 1, 12 (Tenn. Ct. App. 2002).  When a married couple seeks a divorce, the "marital property" must be divided equitably between them, without regard to fault on the part of either party. Tenn. Code Ann. § 36-4-121(a)(1).  "Separate property" is not part of the marital estate and is therefore not subject to division. *See Cutsinger* [*v. Cutsinger*], 917 S.W.2d [238, 241 (Tenn. Ct. App. 1995)].  Thus, it is imperative that the parties, the trial court, or both identify all of the assets possessed by the divorcing parties as either marital or separate so that a proper division can be accomplished.

*Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009).

As pertinent to the issue now before us, Tenn. Code Ann. § 36-4-121 provides that by definition "separate property" includes: "Property acquired by a spouse at any time by gift, bequest, devise or descent; …."  Tenn. Code Ann. § 36-4-121 (b)(2)(D) (2010).

The inquiry does not end here, however, as separate property may in certain circumstances become marital.  As our Supreme Court explained in *Snodgrass*:

> [S]eparate property may be deemed marital by operation of law under theories of commingling or transmutation.  *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002).

* * *

This Court addressed the related doctrines of commingling and transmutation for the first time in *Langschmidt* and adopted the following explanation:

---

[1] Husband also asserts in his brief on appeal that the Trial Court erred in classifying some of the farm equipment purchased with the $688,000 as marital property.  As discussed above, however, the evidence shows that the $688,000 became marital property through commingling with marital funds, which would result in the items purchased with this money also being classified as marital property.  Furthermore, Husband never points to any specific items of farm equipment that he contests were improperly classified, but rather simply requests that this Court "give consideration to some or all of the farm equipment, which was purchased with those funds, being declared his separate property …."

[S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur . . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property . . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

81 S.W.3d at 747 (quoting 2 Homer H. Clark, *The Law of Domestic Relations in the United States* § 16.2 at 185 (2d ed. 1987)).

*Snodgrass*, 295 S.W.3d at 247, 256.

With regard to this issue, the Trial Court specifically found and held that: "the funds passing through the First Tennessee Bank account are determined by the Court to be marital property, on the theory that they have been so commingled that, by [Husband's] own admission, it would be "financial chaos" (sic) to attempt to untangle them …." The evidence in the record on appeal does not preponderate against the Trial Court's findings relative to this issue.

The evidence shows that Husband's inheritance was put into the parties' joint First Tennessee Account where it was commingled with marital funds. The evidence further shows that although some of this money was moved into the Hartford Account, there was no clear evidence of how much of the money was moved, or when it was moved. Furthermore, as the Trial Court found, there was no clear evidence showing that the Hartford Account was intended to remain as Husband's separate property. The evidence shows that Husband's inheritance was unable to be segregated or traced to its product after it was deposited into the First Tennessee Account. Husband himself testified that the money could not be traced, and he agreed that it would be financial chaos to attempt to do so. A rebuttable presumption of a gift to the marital estate was created. Husband failed to rebut the presumption. We find no error in the Trial Court's classification of the Hartford Account as marital property.

-13-

We next consider whether the Trial Court erred in dividing the marital property. As our Supreme Court has explained:

This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

* * *

In a proceeding for divorce or legal separation, the trial court is authorized, prior to determining the support and maintenance of one party by the other, to "equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1) (2005). The trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate. *See Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). The division of assets is not a mechanical process and trial courts are afforded considerable discretion. *Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001).

*Keyt v. Keyt*, 244 S.W3d 321, 327-28 (Tenn. 2007) (footnote omitted).

Further, our Supreme Court has instructed:

-14-

[M]arital property must be divided equitably between the parties based on the relevant factors enumerated in Tennessee Code Annotated section 36-4-121(c) without regard to fault on the part of either party. Tenn. Code Ann. § 36-4-121(a)(1). Section 36-4-121(a)(1) requires an *equitable* division of marital property, not an *equal* division. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002).

*Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010).

Tennessee Code Annotated § 36-4-121 (c) provides:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
(4) The relative ability of each party for future acquisitions of capital assets and income;
(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
(6) The value of the separate property of each party;
(7) The estate of each party at the time of the marriage;
(8) The economic circumstances of each party at the time the division of property is to become effective;
(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
(10) The amount of social security benefits available to each spouse; and
(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121 (c) (2010).

Husband argues in his brief on appeal that the fifth factor contained in Tenn. Code Ann. § 36-4-121 (c) "weighs heavily in favor of [Husband]." Husband states that "but for a $688,000 inheritance received by Husband, and, except for the fact Husband had a substantial 401(k) retirement account, at the time the parties married, the parties would in no way have anywhere near the amount of assets which were divided by the court."

We disagree with Husband's assertion that factor five should be relied upon any more heavily than the other relevant factors. All relevant factors must be considered when making an equitable division of marital property. The record reveals that the Trial Court did consider all relevant factors. Furthermore, the evidence in the record on appeal does not support Husband's assertion that the fifth factor weighs heavily in his favor. Rather, the evidence shows that Wife fulfilled her role as a homemaker and her contribution shall be given the same weight as Husband's contribution.

Husband asserts that the evidence shows that "while both parties worked at different times during the marriage, that Wife's funds were always kept as her separate funds, in her own bank accounts." We disagree. Although Husband made this assertion at trial, the evidence shows that Wife used her own money, including her inheritance received during the marriage and the money she received from selling her blood plasma, to purchase, among other things, gas, items for the marital home, and gifts for Husband. Furthermore, the Trial Court specifically found Husband's testimony "lacked significant credibility in several respects …," and, we give great deference to the Trial Court's findings with regard to credibility.

In his brief on appeal, Husband also argues:

if the court finds that all the property found by the trial court is marital property, then [Husband] would urge this court to grant him 65% of the monies received on the sale of the above-listed property, and grant Wife 35% of the same. Such a ruling would more fairly adjust the equities in this matter.

In essence, Husband is requesting that this Court tweak the Trial Court's distribution of marital property. We decline to do so. We find no error in the Trial Court's distribution of the marital property, and we affirm on this issue.

Next, we consider whether the Trial Court erred in awarding Wife alimony. As pertinent to this issue, our Supreme Court has explained:

For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support.

*See Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce . . . the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor . . . ."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

\* \* \*

[T]ransitional alimony, is appropriate when a court finds that rehabilitation is not required but that the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce. Tenn. Code Ann. § 36-5-121(d)(4), (g)(1); *Riggs*, 250 S.W.3d at 456 n.5. Simply put, this type of alimony "aid[s] the person in the transition to the status of a single person." *Mills v. Mills*, No. M2009-02474-COA-R3-CV, 2010 Tenn. App. LEXIS 501, 2010 WL 3059170, at *5 (Tenn. Ct. App. Aug. 4, 2010); *see also Montgomery v. Silberman*, No. M2009-00853-COA-R3-CV, 2009 Tenn. App. LEXIS 787, 2009 WL 4113669, at *2 (Tenn. Ct. App. Nov. 24, 2009) (affirming trial court's award of transitional alimony to wife "to bridge the gap, so to speak, between her married life and single life"); *Engesser v. Engesser*, 42 So. 3d 249, 251 (Fl. Dist. Ct. App. 2010) (en banc) (describing transitional alimony as "[b]ridge-the-gap alimony" designed to "smooth the transition of a spouse from married to single life").

*Gonsewski v. Gonsewski*, ___ S.W.3d ____, No. M2009-00894-SC-R11-CV, 2011 Tenn. LEXIS 872, at **7-10, *19 (Tenn. 2011).

The Trial Court awarded Wife transitional alimony in the amount of $1,500.00 per month "until both the Farm and Gatlinburg properties are sold." The Trial Court considered the relevant factors contained in Tenn. Code Ann. § 36-5-121 and made specific factual findings. Without again reiterating all of these findings, we note that the evidence in the record does not preponderate against the Trial Court's findings, particularly the findings that Wife has shown a need and that Husband has the ability to pay.

Furthermore, we note that the Trial Court specifically tied the end date of this alimony to the sale of the Farm and Gatlinburg properties, when Wife would receive her share of these marital assets. As the evidence in the record clearly shows that Husband had previously been ordered to list these properties for sale and had deliberately refused to comply with the Trial Court's orders, it is clear that Husband has some measure of control over the duration of the alimony award. If Husband continues to refuse to list the properties for sale, then Husband will continue to be required to pay this alimony. We find no error in the award of alimony, and we affirm on this issue.

We next consider whether the Trial Court erred in awarding Wife a judgment for attorney's fees against Husband. In *Gonsewski*, our Supreme Court also instructed:

It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. See Tenn. Code Ann. § 36-5-121 (h)(1)

-18-

("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). The decision whether to award attorney's fees is within the sound discretion of the trial court. *Crabtree*, 16 S.W.3d at 361; *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121 (i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997). Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, see *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, *see Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. *See id.* at 185.

*Gonsewski*, ____ S.W.3d at ____, 2011 Tenn. LEXIS 872, at **32-33.

The Trial Court made specific findings with regard to the award of attorney's fees against Husband. Specifically, the Trial Court found that Wife: "otherwise lacks sufficient funds to pay such fees, and her ability to pay the fees is solely dependant upon her use of the assets awarded her in the divorce. [Wife] has no independent assets within which to satisfy such fees." The evidence does not preponderate against these findings. Furthermore, the Trial Court found that: "[Husband's] conduct necessitate the incurring of significant and substantial attorneys' fees which [Wife] should not have had to bear, but for the harassing and contemptuous conduct by [Husband]." The record contains much support for this particular finding. We find no abuse of discretion in the award to Wife of attorney's fees from Husband in the amount of $63,474.34 and costs in the amount of $2,965.77.

Next, we consider the issue of whether the Trial Court erred in awarding Wife a judgment for attorney's fees against Son. In *Cracker Barrel Old Country Store, Inc. v. Epperson*, our Supreme Court explained:

Tennessee, like most jurisdictions, adheres to the "American rule" for award of attorney fees. *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998); *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985). Under the American rule, a party in a civil action may

-19-

recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case. *Taylor*, 158 S.W.3d at 359; *John Kohl*, 977 S.W.2d at 534.

*Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (footnote omitted).

In the case now before us, no contractual or statutory provision exists which would allow Wife to recover an award of attorney's fees against Son, nor is there a recognized exception applicable to this situation. The fact that Son may have been extremely and unnecessarily uncooperative during the pendency of this suit, and the fact that Wife ultimately prevailed against Son simply are insufficient bases for awarding Wife attorney's fees against Son. As such, we vacate the award to Wife of a judgment against Son in the amount of $4,083.50 for attorney's fees.

Finally, we address Wife's request for an award of attorney's fees on appeal. In the exercise of our discretion in light of all relevant factors, we award Wife her attorney's fees on appeal. We remand this case to the Trial Court for a determination of the appropriate amount of such fees.

## Conclusion

The judgment of the Trial Court is vacated as to the award to Wife of attorney's fees against Son. The remainder of the Trial Court's judgment is affirmed. This cause is remanded to the Trial Court for further proceedings consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellant, Donald B. May, and his surety.

_____
D. MICHAEL SWINEY, JUDGE